******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# IN RE AISJAHA N.*
## (SC 20612)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The respondent mother appealed from the decision of the trial court vesting permanent legal guardianship of the minor child, A, in her maternal grandmother. On the basis of the respondent mother's substance abuse, poor parenting, and unrelated mental health issues, the Department of Children and Families placed A in the home of her maternal grandmother. Thereafter, the petitioner, the Commissioner of Children and Families, filed a neglect petition, and the trial court adjudicated A neglected and ordered her committed to the care and custody of the petitioner. Subsequently, the petitioner filed a motion for permanent legal guardianship, requesting that the trial court vest permanent legal guardianship of A in her maternal grandmother, to which the respondent mother objected. A hearing on the motion was held remotely via the Microsoft Teams platform amid the COVID-19 pandemic. Prior to the start of the mother's testimony, which occurred after the parties' closing arguments because the respondent mother indicated to her counsel at that point that she wanted "to be heard," the petitioner's counsel noted, for the record, that the mother was on the phone but not on video. The court asked whether anyone had an objection to proceeding with the mother testifying via audio only. There was no objection, and the mother then briefly testified. On appeal from the trial court's decision vesting permanent legal guardianship of A in her maternal grandmother, *held*:

1. The respondent mother's unpreserved claim that she was denied due process of law under the fourteenth amendment to the United States constitution by virtue of the trial court's failure to ensure that she was present by two-way video technology was unavailing: the record was inadequate to review this claim insofar as the record was largely silent regarding the nature of the mother's participation in the virtual hearing, and, although the respondent mother relied on a statement by the petitioner's counsel indicating that, after the close of evidence, the mother appeared by audio and not video during her testimony, the record was silent as to whether she appeared by video at any point prior to that during the proceedings; moreover, because the record was silent as to what type of phone the mother used to participate in the hearing and whether the phone had video capability, this court could not determine whether the respondent mother simply chose to turn her video off or whether she was unable to participate via video as a result of inadequate technology; furthermore, the respondent mother waived any argument with respect to testifying via audio only when she, her counsel and her guardian ad litem failed to object, at the trial court's express invitation, to proceeding without video.

2. This court declined the respondent mother's invitation to invoke its supervisory authority over the administration of justice to adopt a rule requiring that a trial court, before conducting a virtual hearing or trial in a child protection case, ensure that the parties either appear by two-way videoconferencing technology or waive the right to do so, after a brief canvass: the respondent mother failed to demonstrate that the inability of parties to meaningfully participate in virtual child protection hearings or trials via two-way videoconferencing technology was a pervasive and significant problem that required this court's intervention; moreover, the record was not sufficiently robust to facilitate this court's exercise of its supervisory authority insofar as the record did not even indicate the manner in which the respondent mother appeared during the hearing, with the exception of during her testimony after closing arguments; furthermore, neither the respondent mother, her counsel, nor her guardian ad litem asked the trial court for technical accommodations, and the trial court was fully attentive to potential problems regarding the remote technology and took steps to ensure that the virtual format of the hearing did not negatively impact the respondent mother; nevertheless,

although this court did not address whether a trial court may conduct virtual hearings or trials in circumstances other than during a pandemic, it did take the opportunity to emphasize the importance of ensuring equal access to justice and the proper functioning of technology when a trial court conducts a virtual hearing or trial and that equal access to justice was particularly significant in the context of virtual hearings and trials, given that certain groups, such as indigent litigants, communities of color, older people, and people with disabilities were more likely to lack access to reliable internet service and devices that are adequate to participate in remote court proceedings by videoconferencing technology.

Argued November 18, 2021—officially released June 20, 2022**

*Procedural History*

Petition by the Commissioner of Children and Families to adjudicate the respondents' minor child neglected, brought to the Superior Court in the judicial district of Waterbury, Juvenile Matters, and tried to the court, *Hon. John Turner*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment adjudicating the minor child neglected and ordering commitment to the custody of the petitioner, from which the respondent mother appealed to the Appellate Court, *DiPentima*, *C. J.*, and *Moll* and *Harper*, *Js.*, which affirmed the trial court's judgment; thereafter, this court denied the respondent mother's petition for certification to appeal; subsequently, the court, *Hon. William T. Cremins*, judge trial referee, granted the petitioner's motion for permanent legal guardianship and vested permanent legal guardianship of the minor child in her maternal grandmother, and the respondent mother appealed. *Affirmed.*

*Albert J. Oneto IV*, assigned counsel, for the appellant (respondent mother).

*Evan O'Roark*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Andrei V. Tarutin*, assistant attorney general, for the appellee (petitioner).

*Douglas H. Butler, Giovanna Shay, Shelley White, Nilda R. Havrilla, Agata Raszczyk-Lawska, Raphael Podolsky* and *Janice J. Chiaretto* filed a brief for the Greater Hartford Legal Aid et al. as amici curiae.

*Opinion*

McDONALD, J. This appeal is one of the companion cases to *In re Annessa J.*, 343 Conn. 642,      A.3d (2022), which we also decide today. The respondent mother, Jacqueline H., appeals from the decision of the trial court, which vested permanent legal guardianship of Jacqueline's minor child, Aisjaha N., in a relative, pursuant to General Statutes § 46b-129 (j) (6). On appeal, Jacqueline claims that she was denied due process of law when the trial court failed to ensure that she appeared by two-way video technology at a virtual trial, conducted via Microsoft Teams,[1] on the motion for permanent legal guardianship. Alternatively, Jacqueline asks this court to reverse the decision of the trial court pursuant to our supervisory authority over the administration of justice. Specifically, she asks this court to adopt a procedural rule requiring that a trial court, before conducting a virtual trial in a child protection case, ensure that the parties either appear by two-way videoconferencing technology or waive the right to do so, after a brief canvass. We affirm the decision of the trial court.

The record reveals the following relevant facts and procedural history. Jacqueline has a history of involvement with the Department of Children and Families as a result of her substance abuse, poor parenting, and untreated mental health issues, including schizophrenia and psychotic disorder. Relevant to this appeal, in 2018, the department became involved with Jacqueline due to her continued unstable mental health. Specifically, Jacqueline's adult daughter reported that Jacqueline was behaving erratically, telling Aisjaha that "someone entered [Jacqueline's] home while she was out, the water was unsafe to drink, it was not safe for her to be at home, and that someone was coming to get them." As a result of this behavior, Aisjaha asked her older sister if she could live with her. Concerned about Jacqueline's mental health, Aisjaha's older sister called the police. The police responded to Jacqueline's home, and Jacqueline was subsequently hospitalized under a seventy-two hour psychiatric hold. Aisjaha's older sister took Aisjaha to her home, where they met with a department social worker. While investigating the events surrounding Jacqueline's hospitalization, the department learned that Jacqueline had been forcing Aisjaha, who was then eight years old, to ingest expired human immunodeficiency virus (HIV) medication because Jacqueline believed that a man with HIV had sexually abused Aisjaha. Aisjaha, however, denied having ever been inappropriately touched, and a previous medical examination revealed no sexual trauma. Aisjaha also reported that Jacqueline "yells and is explosive, in that she throws things around in the home, and then vomits after being explosive."

After a department social worker met with Jacqueline

following her release from the hospital, the department placed Aisjaha in the home of her maternal grandmother, and the petitioner, the Commissioner of Children and Families, sought an order of temporary custody of Aisjaha. Thereafter, the trial court, *Hon. Maurice B. Mosley*, judge trial referee, issued the order vesting temporary custody of Aisjaha in the petitioner. At that time, the petitioner also filed a petition alleging that Aisjaha had been neglected. At the initial hearing on the neglect petition, the trial court ordered Jacqueline to undergo a competency evaluation. She participated in that evaluation. The expert who evaluated her later testified that Jacqueline was not competent but could be restored to competency within sixty days if she engaged in mental health treatment, adhered to any prescribed medication, and abstained from smoking marijuana. Two months later, the trial court, *Hon. William T. Cremins*, judge trial referee, found that Jacqueline had not been cooperating with the entities providing her certain services and had not been restored to competency. The court appointed a guardian ad litem for Jacqueline and set the case down for trial on the neglect petition.

Jacqueline did not appear for the trial, and the trial court, *Hon. John Turner*, judge trial referee, proceeded with the trial in her absence, over the objections of Jacqueline's counsel and the guardian ad litem. Judge Turner thereafter adjudicated Aisjaha neglected and ordered her committed to the care and custody of the petitioner. The Appellate Court subsequently affirmed the judgment of the trial court. *In re Aisjaha N.*, 199 Conn. App. 485, 498, 237 A.3d 52, cert. denied, 335 Conn. 943, 237 A.3d 2 (2020).

Approximately one year after the trial court committed Aisjaha to the petitioner's care, the petitioner filed a motion for permanent legal guardianship, requesting that the trial court vest permanent legal guardianship of Aisjaha in her maternal grandmother pursuant to § 46b-129 (j).[2] Jacqueline objected to the petitioner's motion for permanent legal guardianship. Jacqueline's counsel requested that the trial on the motion be conducted via Microsoft Teams due to the COVID-19 pandemic. On January 25, 2021, the trial court, *Hon. William T. Cremins*, judge trial referee, held a virtual trial on the petitioner's motion for permanent legal guardianship via Microsoft Teams. The petitioner's evidence showed that Jacqueline still had not engaged in any mental health treatment and that she remained "adamant that she didn't need mental health services." The petitioner proved, by clear and convincing evidence, one of the grounds for termination of parental rights, namely, the failure to rehabilitate. The petitioner's evidence also demonstrated that Aisjaha was "flourishing" while living with her maternal grandmother.

Relevant to this appeal, when the maternal grand-

mother logged into the trial via Microsoft Teams, the trial court and all counsel could hear her but could not see her on video. Jacqueline's counsel objected to the maternal grandmother's testifying via audio only, and the court stated that, "if there is an objection to the witness testifying by audio only, and she can't get onto the call as a video, then we'll have to continue the [case] until we can either set it up as live or get her access." After Aisjaha's counsel raised an objection, the court reiterated: "[I]f there's any objection to proceeding this way, then we will have to continue the case. . . . [I]f there's any objection at all, [because] this is an unusual way to proceed, I'm not going to go forward." The parties ultimately agreed to allow the maternal grandmother to state certain facts for the record.

After the petitioner's counsel called her last witness, Jacqueline's counsel asked the trial court for a recess, so that she could "call [Jacqueline] to confer with her about whether . . . she still wishes to be heard." The court agreed. Following the recess, Jacqueline's counsel stated that "[Jacqueline] does not wish to testify." Thereafter, during her closing argument, Aisjaha's counsel argued in favor of vesting permanent legal guardianship of Aisjaha in her maternal grandmother, stating that, "since the beginning of the case, Aisjaha has been very clear that she wants to continue living with . . . her grandmother." After the closing arguments of the petitioner's counsel and Jacqueline's counsel, during which Jacqueline repeatedly interrupted the proceedings, the court asked whether Jacqueline's counsel needed a recess to again speak with Jacqueline. Counsel responded in the affirmative, and the court recessed. Jacqueline's counsel then notified the court: "I realize that we've rested and done closing; [Jacqueline], however, is insisting she really wants to be heard, and I've advised against it, but, at this point in time, I'm asking if she can be heard." The court allowed Jacqueline to testify, despite evidence having already been closed. Before Jacqueline testified, however, the court stated that it was having difficulty hearing her due to background noise. Jacqueline replied, "[o]h, I'm outside. I'm walking inside now." She then asked, "can you hear me now?" The court replied, "[y]eah, that's much better." Prior to the start of Jacqueline's testimony, the petitioner's counsel noted, for the record, that Jacqueline "is currently just on the phone; she's not on video." The court asked whether anyone had an objection to proceeding with Jacqueline testifying "on audio, rather than on audio and video." None of the parties objected; nor did Jacqueline's guardian ad litem. Jacqueline then briefly testified in narrative fashion. All parties declined to cross-examine her.

In its memorandum of decision, the trial court noted that Jacqueline had been represented by counsel and that she and her guardian ad litem "were present" for trial on the petitioner's motion for permanent legal

guardianship. The court found that the petitioner had satisfied her burden of proving each element for the establishment of a permanent legal guardianship. Accordingly, the trial court granted the petitioner's motion for permanent legal guardianship and vested permanent legal guardianship of Aisjaha in her maternal grandmother. This appeal followed.[3]

On appeal, Jacqueline raises two claims. First, she claims that she was denied due process of law when the trial court failed to ensure that she appeared by two-way video technology at a virtual trial, conducted via Microsoft Teams, on the motion for permanent legal guardianship. Alternatively, Jacqueline asks this court to reverse the decision of the trial court pursuant to its supervisory authority over the administration of justice. Specifically, she asks this court to adopt a procedural rule requiring that a trial court, before conducting a virtual trial in a child protection case, ensure that the parties either appear by two-way videoconferencing technology or waive the right to do so, after a brief canvass. We address each claim in turn.

I

We begin with Jacqueline's unpreserved claim that she was denied due process of law under the fourteenth amendment to the United States constitution when the trial court failed to ensure that she was present by two-way video technology at the virtual trial.[4] Specifically, she contends that, because "Practice Book § 35a-8 (a) required that [Jacqueline] 'shall be present for trial' . . . [in the absence of] a valid waiver of her presence, she had the right to appear, if not physically before the court, then at least by two-way video technology that closely approximated a live physical hearing, with all the constitutional safeguards traditionally associated with a courtroom trial, to include the right to observe and be viewed by the other participants, the right to confront physically the witnesses against her, and the right to plead her case personally to the fact finder. . . . The court's failure to ensure her virtual presence at trial . . . denied her a fundamentally fair proceeding, in violation of the due process of law." (Citations omitted.)

The petitioner contends that Jacqueline "was not absent or excluded from trial, as she suggests," and "[t]he fact that [she] appeared by audio only during her testimony in no way deprived her of due process." The petitioner notes that this court and the United States Supreme Court have previously held that "testifying by audio means only . . . does not offend the due process rights of a respondent parent." Finally, the petitioner contends that the record is not adequate to review this claim, "given how few details it contains about how [Jacqueline] participated in the trial and whether she could have appeared by video had she wanted to." We agree with the petitioner that the record is inadequate

to review this unpreserved claim. With respect to Jacqueline's testimony, we also conclude that she waived any argument with respect to testifying via audio only when she, her counsel and her guardian ad litem failed to object, at the trial court's express invitation, to proceeding without video.

Jacqueline concedes that she did not raise this claim before the trial court and, therefore, seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Pursuant to *Golding*, "a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40; see also *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). "The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Internal quotation marks omitted.) *In re Azareon Y.*, 309 Conn. 626, 634–35, 72 A.3d 1074 (2013).

As we have explained, under *Golding*, an appellant "may raise . . . a constitutional claim on appeal, and the appellate tribunal will review it, but only if the trial court record is adequate for appellate review. The reason for this requirement demands no great elaboration: in the absence of a sufficient record, there is no way to know whether a violation of constitutional magnitude in fact has occurred. Thus, as we stated in *Golding*, we will not address an unpreserved constitutional claim [i]f the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred . . . . It is well established . . . that parties must affirmatively seek to prevail under . . . *Golding* . . . and bear the burden of establishing that they are entitled to appellate review of their unpreserved constitutional claims." (Citations omitted; internal quotation marks omitted.) *State* v. *Canales*, 281 Conn. 572, 581, 916 A.2d 767 (2007). In considering the adequacy of the record in this case, we are mindful that "[d]ue process is inherently [fact bound] because due process is flexible and calls for such procedural protections as the particular situation demands. . . . The constitutional requirement of procedural due process thus invokes a balancing process that cannot take place in a factual vacuum." (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 523, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct.

424, 160 L. Ed. 2d 340 (2004).

Jacqueline contends that the record is adequate to review her claim because "[t]he trial transcripts reflect that [she] did not appear by two-way video . . . in this [case]." In support of this contention, however, she points to only one instance in the January 25, 2021 trial transcript indicating that the trial court could not see her. Specifically, prior to Jacqueline's testimony, after the close of evidence, the petitioner's counsel noted that Jacqueline "is *currently* just on the phone; she's not on video." (Emphasis added.) There is no other indication in the record regarding whether Jacqueline participated in the trial by audio or video. The statement by the petitioner's counsel indicates only that Jacqueline appeared by audio and not by video during her testimony but says nothing about whether she appeared by video at any point prior to that during the proceedings. The record is also silent about what type of phone Jacqueline used to participate in the proceeding and whether the phone had video capability. Appellate counsel also could not provide this court with additional information about the manner of Jacqueline's participation. As a result, the record is silent about whether Jacqueline simply chose to turn her video off or whether she was unable to participate via video as a result of inadequate technology.[5] Because the record is silent as to the exact nature of the device she used, we also do not know whether Jacqueline had the ability to see the video of the proceedings. Because Jacqueline did not raise this issue at trial, the trial court was unable to assess any potential problems with Jacqueline's ability to participate via video and had no occasion to consider alternative means for her to participate via video or to continue the trial until it could be held in person. As this court repeatedly has observed, "[o]ur role is not to guess at possibilities . . . but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the appellant's claims] would be entirely speculative." (Internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 63, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Because the record is largely silent regarding the nature of Jacqueline's participation in the virtual trial, we conclude that the record is inadequate to review this unpreserved claim.

Moreover, with respect to Jacqueline's testimony, Jacqueline's counsel asked the trial court to allow Jacqueline to testify after the close of evidence. Moments later, the petitioner's counsel noted that Jacqueline was not on video. When the court asked whether anyone had an objection to proceeding with Jacqueline testifying "on audio, rather than on audio and video," none of the parties objected; nor did Jacqueline's guardian ad litem. As a result, although it is unclear whether

Jacqueline's counsel asked the trial court to allow Jacqueline to testify when she was not on video, thereby inducing any error, it is clear that counsel did not object to Jacqueline's testifying via audio only, thereby waiving any claim that this was error. Cf. *Delahunty* v. *Targonski*, 158 Conn. App. 741, 751, 121 A.3d 727 (2015) (plaintiff waived right to jury trial, as "[t]he failure of the plaintiff to raise an objection at the start of the court trial, after receiving notice that the [third-party] defendant had moved for a court trial and that there had been no jury selection, combined with her active and full participation in the ensuing trial, indicate[d] that she had acquiesced to a court trial and correspondingly relinquished her right to a jury trial"). This is particularly significant given that Jacqueline's counsel had previously objected to Aisjaha's maternal grandmother's testifying via audio only. See, e.g., *State* v. *Ramon A. G.*, 336 Conn. 386, 400, 246 A.3d 481 (2020) ("The rule is applicable that no one shall be permitted to deny that he [or she] intended the natural consequences of his [or her] acts and conduct. . . . In order to waive a claim of law . . . [*i*]*t is enough if he* [*or she*] *knows of the existence of the claim and of its reasonably possible efficacy*." (Emphasis added; internal quotation marks omitted.)). It is well settled that "[a] constitutional claim that has been waived does not satisfy the third prong of [*Golding*] because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the [respondent] of a fair trial . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 399; cf. *Independent Party of CT—State Central* v. *Merrill*, 330 Conn. 681, 723–24, 200 A.3d 1118 (2019) ("*Golding* review is not available when the claimed constitutional error has been induced by the party claiming it. . . . [A] party cannot take a path at trial and change tactics on appeal. . . . [W]hether we call it induced error, encouraged error, waiver, or abandonment, the result—that the . . . claim is unreviewable— is the same." (Citations omitted; internal quotation marks omitted.)). Accordingly, Jacqueline cannot prevail on her claim under prong three of *Golding*, even if the record is adequate to review her claim with respect to her testimony.[6]

## II

Jacqueline also asks this court to reverse the decision of the trial court pursuant to its supervisory authority over the administration of justice. Specifically, she asks us to adopt a procedural rule requiring that a trial court, before conducting a virtual trial in a child protection case, ensure that the parties either appear by two-way videoconferencing technology or waive the right to do so, after a brief canvass.

The petitioner contends that we should not adopt the

rule proposed by Jacqueline because doing so would be tantamount to overruling *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 446 A.2d 808 (1982). In that case, this court held that telephonic testimony adequately protected the due process rights of the respondent father. See id., 435–41. The petitioner notes that, since *In re Juvenile Appeal (Docket No. 10155)*, the Superior Court has "relied [on] that decision and the procedure of allowing respondent parents to participate in child protection hearings via telephone." The petitioner cites to numerous cases in which the trial court followed that procedure and contends that, for many parents, "telephone is . . . the only means by which they can participate in their case." As "long as the respondent parent's testimony is audible to the court and all parties," the petitioner contends, "there is nothing unconstitutional about telephonic testimony." We decline Jacqueline's invitation to exercise our supervisory authority in this case.

Supervisory authority is an extraordinary remedy that should be used "sparingly . . . ." (Citation omitted.) *State* v. *Rose*, 305 Conn. 594, 607, 46 A.3d 146 (2012). "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, [although] not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Constitutional, statutory and procedural limitations are generally adequate to protect the rights of the [litigant] and the integrity of the judicial system. Our supervisory powers are invoked only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010). Overall, "the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). Thus, we are more likely to invoke our supervisory powers when there is a "pervasive and significant problem"; *State* v. *Hill*, 307 Conn. 689, 706, 59 A.3d 196 (2013); or when the conduct or violation at issue is "offensive to the sound administration of justice . . . ." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 239–40, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

"[T]hree criteria must be met before we will consider invoking our supervisory authority. . . . First, the

record must be adequate for review. . . . Second, all parties must be afforded an opportunity to be heard on the issue. . . . Third, an unpreserved issue will not be considered [when] its review would prejudice a party." (Citations omitted.) *In re Yasiel R.*, supra, 317 Conn. 790.

In this case, Jacqueline has not demonstrated that the inability of parties to meaningfully participate in virtual child protection trials via two-way videoconferencing technology is a "pervasive and significant problem" requiring our intervention. *State* v. *Hill*, supra, 307 Conn. 706. Additionally, for the reasons explained in part I of this opinion, the record in this case is not sufficiently robust to facilitate our exercise of supervisory authority because the record does not even indicate the manner in which Jacqueline appeared during trial, with the exception of during her testimony after closing argument. See, e.g., *State* v. *Turner*, 334 Conn. 660, 687, 224 A.3d 129 (2020) ("[This] case does not present the exceptional and unique circumstances that would justify this court's exercising its supervisory authority. Without an adequate record to determine that an evidentiary error exists, let alone was harmful, we are not inclined to reverse the defendant's conviction."); *State* v. *Chambers*, 296 Conn. 397, 411, 414, 994 A.2d 1248 (2010) (record was inadequate for this court to determine, under either *Golding* or supervisory authority, whether meeting, in chambers, between trial court, prosecutor, and defense counsel was critical stage of proceeding, at which criminal defendant had constitutional right to be present). We cannot conclude that Jacqueline was deprived of the opportunity to participate in the trial via two-way videoconferencing technology, as she may have simply chosen to turn her video off during her testimony.

We also note that, although trial courts have an obligation to ensure that parties have the ability to meaningfully participate, neither Jacqueline, her counsel, nor her guardian ad litem asked for technical assistance or accommodations from the trial court. Nonetheless, the trial court was fully attentive to potential problems regarding the remote technology and took steps to ensure that the virtual format of the trial did not negatively impact Jacqueline. For example, the court paused the proceedings several times to allow Jacqueline to confer with her counsel, asked if any party objected to Jacqueline's testifying via audio only, paused the proceedings when it could not hear Jacqueline, paused the proceedings to allow Jacqueline's counsel to confer with Jacqueline's guardian ad litem, and repeatedly noted that it would continue the case if the parties did not agree to the maternal grandmother's testifying via audio only. See, e.g., *People ex rel. R.J.B.*, 482 P.3d 519, 525 (Colo. App. 2021) (noting importance of trial court's taking steps to remedy technological issues during virtual termination of parental rights trial), cert. denied,

Colorado Supreme Court, Docket No. 21SC115 (March 15, 2021); *In re M.M.*, Docket No. 21A-JT-840, 2021 WL 4839067, *3 (Ind. App. October 18, 2021) (decision without published opinion, 176 N.E.3d 589) (explaining that trial court rectified any technological issues during virtual termination of parental rights hearing and respondent mother was able to meaningfully participate). We therefore decline Jacqueline's invitation to invoke our supervisory authority to create a rule requiring that a trial court, before conducting a virtual trial in a child protection case, ensure that the parties either appear by two-way videoconferencing technology or waive the right to do so, after a brief canvass.

Although we do not address whether a trial court may conduct virtual trials in circumstances other than during a pandemic, we take this opportunity to emphasize the importance of ensuring equal access to justice when a court undertakes a virtual trial. Equal access to justice is particularly significant in the context of virtual hearings and trials given the digital divide.[7] As the amici curiae note in their brief to this court, "[n]ationwide and in Connecticut, indigent litigants, communities of color, older people, and people with disabilities are more likely to lack access to reliable internet service and devices adequate to participate in remote court proceedings by videoconferencing technology." For example, one report found that nearly one quarter of all Connecticut households lack high-speed internet. See J. Horrigan, The Digital Divide in Connecticut: How Digital Exclusion Falls Hardest on Low-income Households in Cities, Older Adults, Communities of Color, and Students (September, 2020) p. 3, available at https://www.dalioeducation.org/Customer-Content/www/CMS/files/DigitalDivide_Report_2020_Final.pdf (last visited June 15, 2022). "Connectivity deficits fall hardest on low-income residents, older adults, and communities of color." Id. As a result, some commentators have suggested that "the most obvious area of concern in moving court hearings and trials online is the digital divide, which perpetuates unfairness in access to proceedings or timely case resolutions due to disparities in tech ownership or familiarity." A. Cahn & M. Giddings, Virtual Justice: Online Courts During COVID-19 (July 23, 2020) p. 9, available at https://www.law360.com/articles/1295067/attachments/0 (last visited June 15, 2022). Courts must be especially vigilant to ensure that parties are not disadvantaged by an inability to meaningfully participate in virtual proceedings.

Some jurisdictions have addressed the digital divide "in a novel and competent way by creating a number of remote public sites . . . that provide a safe and private location, a computer and connectivity." M. Spekter, Moving Courts Online: The Advantages Have Been Proven, and Online Court Proceedings Are Here To Stay, Law Practice Magazine, July 1, 2021, available at https://www.americanbar.org/groups/law_practice/publications/law_practice_magazine/2021/ja21/spekter/ (last visited June

15, 2022). We note that the Connecticut Judicial Branch has created the Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties to "assist anyone who is preparing to participate in a remote court hearing through Connecticut's 'Remote Justice Virtual Courtroom.' This includes counsel, self-represented parties, and other necessary hearing participants, such as witnesses." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 4, available at https://jud.ct.gov/HomePDFs/ConnecticutGuideRemote Hearings.pdf (last visited June 15, 2022) (Connecticut Guide to Remote Hearings). The Connecticut Guide to Remote Hearings provides that, "[i]f you do not have a phone or device to videoconference or access to the [I]nternet, let the court know as soon as possible. The court may be able to help you find a way to participate, or your hearing may be postponed until everyone can participate." Id., p. 5. The Quick Reference Guide for Remote Court Proceedings that accompanies the Connecticut Guide to Remote Hearings provides that "[s]ome courts have space in the courthouse with technology to allow you to participate in your remote court proceeding. These rooms, known as '[r]emote [r]ooms,' may be available to you. Contact the court to find out."[8] Connecticut Judicial Branch, Quick Reference Guide for Remote Court Proceedings (November 13, 2020) p. 1, available at https://jud.ct.gov/RemoteJustice/Docs/ Quick_Ref_Guide_Remote_Hearings.pdf (last visited June 15, 2022). Importantly, the Connecticut Guide to Remote Hearings also notes that "[c]ourt [s]ervice [c]enters provide services for self-represented parties, members of the bar, and the community at large. They are located within [j]udicial [d]istrict [c]ourthouses and are staffed by Judicial Branch employees trained to assist all court patrons. Several [c]ourt [s]ervice [c]enters have bilingual staff. Court [s]ervice [c]enters can provide statewide calendar and docket information (civil and family cases), court forms, [j]udicial [p]ublications and self-help materials, public use computers and printers with internet access, and word processing, electronic filing, printers, copiers, fax machines, scanners, and work space." Connecticut Guide to Remote Hearings, supra, p. 26. In situations in which parties or witnesses express an inability to participate in virtual proceedings, it is imperative that our courts either provide alternative means of accessing the technology needed to participate—such as at these court service centers—or continue the proceeding until it can be conducted in person or until such time as the party or witness has secured the necessary technology to meaningfully participate in the proceeding. Courts must also be mindful of ensuring that parties have equal access to the same technological means to participate in the virtual trial, such as ensuring that both parties participate by either video and audio or audio only.

It is also important that trial courts, when undertaking virtual proceedings, ensure the proper functioning of technology. If the technology is not functioning properly, the court must take corrective measures then to remedy the technological problem, or continue the case until either it can be conducted in person or the technology problem can be resolved. See, e.g., *Diaz* v. *Commonwealth*, 487 Mass. 336, 342, 167 N.E.3d 822 (2021) ("We . . . urge judges to pay careful attention to the technology. If the technology does not function as described, it is crucial that the court suspend the hearing, rather than risk sacrificing certain of the defendant's constitutional rights.").

The decision of the trial court granting the petitioner's motion for permanent legal guardianship is affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** June 20, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] Microsoft Teams is "collaborative meeting [computer software] with video, audio, and screen sharing features." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (November 23, 2021) p. 5, available at https://jud.ct.gov/HomePDFs/ConnecticutGuideRemoteHearings.pdf (last visited June 15, 2022).

[2] General Statutes § 46b-129 (j) provides in relevant part: "(2) Upon finding and adjudging that any child or youth is uncared for, neglected or abused the court may . . . (C) vest such child's or youth's permanent legal guardianship in any person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage . . . .

* * *

"(6) Prior to issuing an order for permanent legal guardianship, the court shall provide notice to each parent that the parent may not file a motion to terminate the permanent legal guardianship, or the court shall indicate on the record why such notice could not be provided, and the court shall find by clear and convincing evidence that the permanent legal guardianship is in the best interests of the child or youth and that the following have been proven by clear and convincing evidence:

"(A) One of the statutory grounds for termination of parental rights exists, as set forth in subsection (j) of section 17a-112, or the parents have voluntarily consented to the establishment of the permanent legal guardianship;

"(B) Adoption of the child or youth is not possible or appropriate;

"(C) (i) If the child or youth is at least twelve years of age, such child or youth consents to the proposed permanent legal guardianship, or (ii) if the child is under twelve years of age, the proposed permanent legal guardian is: (I) A relative, (II) a caregiver, or (III) already serving as the permanent legal guardian of at least one of the child's siblings, if any;

"(D) The child or youth has resided with the proposed permanent legal guardian for at least a year; and

"(E) The proposed permanent legal guardian is (i) a suitable and worthy person, and (ii) committed to remaining the permanent legal guardian and assuming the right and responsibilities for the child or youth until the child or youth attains the age of majority. . . ."

[3] Jacqueline appealed from the decision of the trial court to the Appellate Court, and the appeal was transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] We note that this claim is similar to those raised by the respondent parents in *In re Annessa J.*, supra, 343 Conn. 642, and *In re Vada V.*, 343 Conn. 730,    A.3d    (2022), which we also decide today. The respondent parents in these companion cases argued that their federal due process rights were violated given the virtual nature of the termination of parental rights trials. In each of the companion cases, however, the respondents appeared via audio and video for at least a portion of the trial. Jacqueline's

constitutional claim is premised on the fact that she appeared via audio only.

[5] It is possible that Jacqueline participated in the trial via a device with video capabilities given that, during trial, she informed the court that she was walking around outside. It is also possible that her device did not have video capabilities or was malfunctioning. Because the record is silent on these issues, we cannot evaluate the nature of her participation in the proceedings.

[6] We also note that Jacqueline does not address the impact of this court's holding in *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 435–41, 446 A.2d 808 (1982), on her claim. In that case, this court held that the trial court did not violate the respondent's constitutional rights by conducting the termination of parental rights trial while the respondent participated via telephone instead of in the physical presence of the trial court. See id. We explained that "[w]e cannot . . . say that the lack of a visual image seriously disadvantaged the trial court in making its determination. . . . [L]imiting the opportunity to assess the respondent's demeanor to its auditory component seems to us to entail only the most marginal risk that the [trial court] would be misled in evaluating the respondent's credibility." Id., 438. Applying the three-part test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), this court determined that telephonic testimony adequately protected the due process rights of the respondent. See *In re Juvenile Appeal (Docket No. 10155)*, supra, 435–41.

[7] "The idea of the 'digital divide' refers to the growing gap between the underprivileged members of society, especially the poor, rural, elderly, and [disabled] portion of the population who do not have access to computers or the internet; and the wealthy, middle-class, and young Americans living in urban and suburban areas who have access." Digital Divide, available at https:// cs.stanford.edu/people/eroberts/cs181/projects/digital-divide/start.html (last visited June 15, 2022) (Stanford University project discussing current state of digital divide and its related causes).

[8] We note that, by November, 2021, after the trial in the present case, "the Judicial Branch ha[d] outfitted [eighty-six] [r]emote [r]ooms with Microsoft Teams access in courthouses across the state." Connecticut Judicial Branch, Access to Justice Commission, Draft Minutes of the Meeting (November 4, 2021) p. 4, available at https://www.jud.ct.gov/Committees/access/access_minutes _110421.pdf (last visited June 15, 2022). The purpose of these remote rooms is to "allow parties to utilize Judicial Branch technology to participate in remote court events." Id.